## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| HECTOR M. ROSARIO LOPEZ, and his wife NORA MONSEGUR RIVERA, and their legal conjugal partnership; and their minor children C.M.R. and C.R.;<br> Plaintiffs<br><br>v.<br><br>Blue Line Rental PR, Inc. (known before as Volvo Rents Puerto Rico, Inc.); Blue Line Rental LLC; Volvo Construction Equipment Rents, Inc. or its successors; INSURANCE COMPANY ABC<br> Defendants | CIVIL NO.<br><br>CIVIL ACTION – EMPLOYMENT DISCRIMINATION<br><br>JURY TRIAL REQUESTED |

## COMPLAINT

TO THE HONORABLE COURT:

NOW COMES the Plaintiffs, Hector M. Rosario López ("Rosario"), Nora Monsegur Rivera ("Monsegur"), their legal partnership, and C.M.R. and C.R. ("minor children C.M.R. and C.R."), through the undersigned attorneys and respectfully states, alleges and prays as follows:

### I. JURISDICTION

1.     The jurisdiction of this Honorable Court is invoked pursuant to 28 U.S.C. § 1331 (federal question) as it arises under the laws of the United States of America and pursuant to 28 U.S.C. §1343(4) as it seeks relief under Title I of the Americans with Disabilities Act ("ADA") and ADA Amendments Act of 2008 ("ADAA"), 42 U.S.C. §§ 12101 *et seq.*, to recover damages and/or secure equitable or other relief under Title VII of the Civil Rights Act as amended (42 U.S.C. §2000e *et seq.* and §§ 1981a and 1988); damages pursuant to Federal Medical Leave Act 29 U.S.C. § 2601, *et seq.* ("FMLA") , and relief under the Fair Labor Standards Act ("FLSA") of 1938, as amended, 29 U.S.C. §201, *et seq.*

2.     The Plaintiffs also invoke this Honorable Court's supplemental jurisdiction pursuant to 28 USC § 1367(a) for Rosario's claims arising under the following Puerto Rico state laws: Law Number 44 of June 2, 1984, as amended, P.R. Laws Ann., tit. 1, §§ 501-511b, ("Law 44"), equivalent to ADA; Law Num. 80 of May 30, 1976, as amended, P.R. Laws Ann., tit. 29, §§ 185a-185m ("Law 80"); Law Number 139 of

June 26, 1968, Puerto Rico's Disability Benefit Act, 11 P.R. Laws Ann. § 201 *et seq.* ("SINOT"); Law Number 379 of May 15, 1948, Puerto Rico Minimum Wage Act and Articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 5141-5142.

3.   Venue is proper to bring this action pursuant to 28 U.S.C. § 1391(b)(2), since this action is brought in the judicial district in which all or substantial part of the events or omissions giving rise to these claims occurred.

4.   This action involves a sum in excess of seventy-five thousand dollars ($75,000.00) exclusive of interest and costs.

5.   The Parties are all citizens of the Commonwealth of Puerto Rico, except for one of the defendants, Blue Line Rental LLC, that is not a Puerto Rico citizen.

6.   On December 5, 2013, Rosario filed a charge of discrimination with the Anti Discrimination Unit in San Juan, Puerto Rico. The charge was filed within one hundred eighty (180) days after the occurrence of one or more of the unlawful employment practices alleged herein.

7.   On October 9, 2014, the Equal Employment Opportunity Commission ("EEOC") issued Rosario a Notice of Right to Sue letter. Rosario filed the complaint in this case within the ninetieth (90th) day since the date on which the EEOC issued the Notice of Right To Sue.

8.   Consequently, all jurisdictional prerequisites to the filing of this lawsuit have been fulfilled, and Plaintiff Rosario has exhausted his administrative remedies as required by law.

## II. PARTIES

9.   Plaintiff Rosario is married to Monsegur, which constitutes a legal conjugal partnership under the laws of the Commonwealth of Puerto Rico, both are citizens of the United States of America, domiciled in Añasco, Puerto Rico.

10. Rosario and Monsegur, are the father and mother of their two minor children, C.M.R. who is 10 years old and C.R. who is 5 years old, both citizens of both citizens of the United States of America, domiciled in Añasco, Puerto Rico.

11. Volvo Construction Equipment Rents, LLC, who around January 2014 changed its name to Blue Line Rental, LLC (hereinafter "Blue Line LLC"), is a domestic limited liability company formed in 2001, under the laws of the State of Delaware with the following address: Corporation Trust Center 1209 Orange St., Wilmington, New Castle, DE 19801, and with principal executive offices located at 127 Walnut Bottom Road, Shippensburg, PA 17257.

12. Volvo Rents Puerto Rico, Inc., who on or around January 2014 changed its name to Blue Line Rental PR, Inc. (hereinafter "Blue Line PR"), is a domestic corporation organized under the Laws of the Commonwealth of Puerto Rico, with the following address, according to the Puerto Rico State Department: P.O. Box 364168, San Juan, P.R. 00936-4168.

13. Blue Line PR, is a wholly owned subsidiary of its parent company Blue Line LLC.

14. Plaintiff Rosario was employed by Blue Line PR until September 16, 2013 when his employment was discriminatorily and unjustly terminated.

15. Upon information and belief, Blue Line PR and Blue Line LLC, were joint employers of Plaintiff and for purposes of this action should be treated as a single entity (hereinafter collectively referred to as Defendants).

16. Notwithstanding the foregoing, Defendants, whether treated separately or jointly, have continuously employed more than 20 persons at all relevant times and has been an "employer", as that term is defined by the laws invoked in the present Complaint.

17. At all relevant times, Defendants, whether treated separately or jointly, have been continuously engaged in an industry affecting commerce within the meaning of § 101(5) of the ADA, 42 U.S.C.A. § 12111(5), and § 107(7) of the ADA, 42 U.S.C.A. § 12117(a), which incorporates by reference § 701(g) and (h) of Title VII, 42 U.S.C.A. § 20003 (g) and (h).

18. At all relevant times, Defendants, whether treated separately or jointly, are a covered entity under Section 101(2) of the ADA, 42 U.S.C.A. § 12111(2).

19. Insurance Company ABC is a generic term to designate any entity or entities having insured Defendants for the acts alleged in the Complaint.

### III. NATURE OF ACTION

20. This is an action brought by Rosario, his wife, Nora Monsegur Rivera ("Monsegur"), and the legal conjugal partnership constituted between the two, against Blue Line PR and Blue Line LLC, pursuant to ADA, as amended, and Title VIII (42 U.S.C. § 1981a and 1988), FMLA and FLSA, and claims arising under P.R. state laws: Law 44, Law 80, SINOT, Law 379 and Articles 1802 and 1803 of P.R Civil Code.

21. Rosario claims discrimination because of disability, denial of reasonable accommodation, retaliation due to having opposed to Defendants' unlawful employment practices, and violation of his civil rights.

22. Rosario is requesting past and future compensatory damages, punitive damages for Defendants' intentional discrimination, front and back pay, double damages, and declaratory and equitable relief, costs, interests and attorneys' fees, as well as damages suffered by Plaintiff Monsegur pursuant to Article 1802 of PR Civil Code, and any other remedy available to Rosario and Monsegur, the legal conjugal partnership constituted between them, and to their minor children C.M.R and C.R. as provided under federal and state law.

23. Plaintiff reserves the right to amend and add additional causes of action to this Complaint by regular amendment pursuant to Rule 15 of Federal Rules of Civil Procedure.

### IV. FACTS COMMON TO ALL CAUSES OF ACTION

24. On December 2011, Defendants acquired Casco Rentals' operations in Puerto Rico.

25. Rosario had been working as a full time employee for Casco Rentals since May 26, 2004, occupying the position of Rental Coordinator.

26. Defendants kept most of Casco Rental employees, including Rosario, and credited them the years of service previously worked with Casco Rental as years of service with the Defendants.

27. After the Defendants took over Casco Rental around December 2011, Rosario remained in the position of Rental Coordinator he occupied with Casco Rental.

28. Since 2004 there were three Rental Coordinator positions, one of them occupied by Rosario.

29. On or around August 2011 Rosario was diagnosed with a medical condition known as diabetic polyneuropathy and lumbar neuritis.

30. Immediately after his diagnosis Rosario informed his supervisor, Emilio Márquez ("Márquez"), the Defendants' General Manager for Puerto Rico offices of his condition.

31. Mr. Emilio Márquez, was Rosario's immediate supervisor since 2004 until November 2012.

32. On or around August 2011 Rosario also informed Lillian Cruz ("Cruz"), the only person in charge of human resources, about his disability and provided her with a copy of his handicapped parking permit.

33. Around June 2012, Mr. Márquez had to take a medical leave.

34. While Márquez was out on disability, approximately since June 2012 and while he still was Rosario's supervisor, Rosario would communicate with Márquez through the phone and via email.

35. Early in September 2012, Rosario's medical condition forced him to take four weeks of sick leave.

36. On September 28, 2012, Rosario sent Cruz a medical certification from his physician, stating he could return to work on October 1, 2012, with restrictions not to lift weight nor to walk long distances.

37. Between September 28 and October 2, 2012:

    a. Cruz informed Rosario that she received instructions from Defendants' offices in the U.S., that Rosario could not return to work until he provided a medical certificate stating he had no restrictions;

    b. Cruz suggested Rosario to request a short term disability leave and sent him via email the forms he should complete through USAble Life Insurance Company ("USAble"), a private insurance

company hired by Defendant to provide its employees with the disability insurance coverage mandated by SINOT.

38. In that same conversation Rosario told Cruz:

a. that the restrictions mentioned in the medical certificate didn't prevent him from fulfilling the duties of his position as Rental Coordinator, and he was able and fully capable to return to work;

b. that the Rental Coordinator position was of a clerical/administrative nature and did not involve any type of physical activity such as lifting weights, standing for extended periods of time or walking long distances, none of which were included in his job description;

c. Rosario told Cruz that the restrictions mentioned in the certificate, of not lifting weights or walking long distances, were activities that if performed by him would worsen the symptoms of his condition, as it happened later on when he was forced to do so when he was transferred against his will to the position of Service Coordinator.

39. On October 4, 2012, Rosario's physician stated in the form submitted to USAable that he should not be lifting weight or standing for long periods of time.

40. While on medical leave, during the first weeks of October 2012, Rosario accessed his work email and saw a message that included the company's internal newsletter where it was announced that the position he had been occupying as Rental Coordinator was listed vacant.

41. Rosario immediately contacted Cruz, from human resources, via phone, asking why his position had been listed vacant, insisted he was able and fully capable of fulfilling his duties as Rental Coordinator and once again asked to be permitted to return to work. Cruz told Rosario that his job was safe and once again insisted that Rosario provided a medical certificate stating he had no restrictions so he could return to work.

42. Due to Defendants insistence of not letting Rosario come back to work, Rosario asked his physician to provide him with a medical certificate that stated he had no restrictions to return to fulfill his duties and obligations as a Rental Coordinator, which as previously stated did not require lifting weights nor walking long distances.

43. On October 26, 2012, Rosario provided Cruz with a medical certificate stating that as of November 1, 2012 he could start working without restrictions.

44. A couple of days before Rosario returned to work on November 1, 2012, he found out that María Ayala ("Ayala"), a Defendants' employee in Puerto Rico, who previously occupied the position of Service Coordinator now occupied his position as Rental Coordinator.

45. Ayala received a salary raise when she became Rental Coordinator but Rosario did not, even though he asked for one when he was transferred to the Service Coordinator position.

46. On November 1, 2012 Rosario returned to work. That same day Rosario had a meeting with Cruz and with Fernando del Águila ("Del Águila"), Defendants' new branch manager for Puerto Rico offices, whom Rosario met for the first time.

47. During this meeting, Del Águila informed Rosario he would be reassigned to the position of Service Coordinator.

48. Rosario expressed his disagreement and requested to be reinstated to the position of Rental Coordinator, but his request was denied.

49. Del Águila, made Rosario believe: (i) this new change would be positive because he was being moved to occupy the only Service Coordinator position Defendants had in Puerto Rico, because Defendant needed his expertise and knowledge in the Service's Department and (ii) that the Service Coordinator position was of an equivalent administrative nature as the Rental Coordinator.

50. Rosario knew that the position of Service Coordinator did not require lifting or having to walk or stand for extended periods of time since in two occasions before, he had been asked to help with the position when it became vacant years before.

51. During the meeting mentioned above in ¶¶ 46-47, Del Águila provided Rosario with a job description for the position of Service Coordinator, which stated he should be able to lift 25 pounds or more, among other things.

52. Before signing the job description, Rosario made a mark to the part it said he 'should be able to lift 25 pounds or more and explained to Del Águila of his disability, that he had been on medical leave

because of it and that he was not supposed to be lifting weights of any kind, or to be standing or walking for too long because those activities worsened the symptoms of his condition. He also explained that his condition was of a progressive nature and even when he was feeling better now there were some activities he was not supposed to perform, such as the ones mentioned above.

53. After expressing his disagreement and making the clarifications mentioned above in ¶ 52, Rosario saw no other option but to accept the position of Service Coordinator.

54. Under the Service Coordinator position, Rosario's new supervisors were Jorge Pagán ("Pagán"), the Services Manager, and Del Águila, the new branch manager. On occasions, when Pagán was not around, Rosario received orders from Rafael Escalera, the Mechanics' Shop Manager.

55. Between December 2011 and January 2012 Defendants implemented new security measures and imposed on certain employees including Rosario the mandatory use of security boots in certain areas.

56. Rosario was never before required to use security boots.

57. During a performance evaluation meeting that took place around January 2013, Rosario was requested to use the security boots.

58. Rosario informed Del Águila, that because of his medical condition using such boots  would cause him a lot of pain and it would further worsen the symptoms of his condition. These boots were very heavy because they are made of steel in the point and its front shape was very narrow making it extremely uncomfortable and painful for Rosario to wear them at all times.

59. Rosario asked Del Águila to provide him with other options that would not require the use of the boots which further affected his condition. Del Águila denied Rosario's request, stating that he had to use the boots if he wanted to keep his job.

60. A couple of weeks after Rosario's evaluation Pagán suggested that Rosario tried other type of boots made of plastic which were not as heavy as the ones made of steel.

61. Rosario went to a specialized store and tried on the plastic boots as well as the steel ones.

62. Rosario told Pagán, none of the boots he tried were suitable to accommodate his needs, because the front point steel boots were heavier though less tight in the front, but the plastic boots even though they were lighter, the front point was too narrow.

63. For the reasons stated, Rosario had no other option than to choose the steel boots that in comparison with the plastic boots hurt his feet less.

64. Rosario had to wear the boots on certain areas, in his case to access his office that was located across the Mechanics Workshop. Once Rosario was in his office he could take them off.

65. Around March 2013, Defendant opened a new Service Coordinator position, the same position held by Rosario, to accommodate Charo Rosario Del Águila, Del Águila's wife.

66. Rosario's desk and office space was assigned to Del Águila's wife. Rosario was moved to a trailer truck, which was and continued to be the place where inventory of mechanical parts was stored.

67. The trailer was located in the patio area where all the equipment and machinery was stored. There Rosario was required to wear boots at all times, including in his office since mechanical parts were stored there and the use of boots was required in that area.

68. The trailer was filthy, dusty, the desk and chair were very uncomfortable, and the air conditioner was constantly out of service.

69. When Rosario told Pagán about his working conditions in the trailer and asked to have the company assign someone to clean it, Pagán told Rosario that he would have to clean his own work space, since maintenance personnel was instructed not to enter the trailer due to security reason. This was not part of his job description.

70. After Rosario was moved to the trailer:

    (i)    He had to wear the boots at all times;

    (ii)    His access to the computer system was restricted, making it more difficult for him to have all the information he needed to fulfill his duties;

    (iii)    He was excluded from a training offered in relation to the use of the new computer software and Del Águila's wife was sent instead;

(iv)   Rosario asked Pagán to provide him with a copy of the computer software user manual but he was never given one;

(v)   Rosario was gradually assigned more work requiring physical activity, which he had previously told Del Águila he could not perform when he signed the job description of Service Coordinator;

71. Before Rosario was moved to the trailer, his duties consisted of clerical and administrative functions such as ordering and buying parts over the internet, opening and closing work orders in the computer, coordinating equipment repair services with clients and mechanics and entering work orders submitted by mechanics for repair and maintenance of equipment.

72. After being moved to the trailer, Rosario was gradually required to perform activities which involved heavy lifting, standing up and walking constantly.

73. Between March and July 2012 Rosario was required by Del Águila to perform a daily inventory of equipment located in the patio, which required Plaintiff to walk and remain standing for at least 40 minutes.

74. Rosario told Del Águila that his condition did not permit him to be continuously walking and suggested for other employees from the patio to do the inventory as it had been done before Rosario was moved to the trailer. Del Águila denied his request by saying that since Rosario had provided a certificate stating he had no restrictions and for that he had to do the work, unless he wanted to lose his job.

75. At least 3 to 4 times a month, Pagán would ask Rosario to perform a second inventory of the equipment which Rosario had already performed earlier during the day. Pagán told Rosario, that Del Águila had requested the second inventory and that it had to be done by Rosario.

76. Between March and July 2012 Rosario was required by Jerry Dohn, Service Manager of Defendant Blue Line LLC, in the US, to inspect the Mechanics Workshop, every day, every half to one hour, to check the status of the work and ensuring that mechanics were doing their jobs, even when Pagán and Escalera where the managers in charge of doing that. Such inspections required Rosario to be walking and standing for at least 10-15 minutes every time.

77. Rosario told Jerry Dohn, about his disability and his difficulty performing tasks such as walking and standing for more than 5 minutes. Later on, Jerry Dohn informed Rosario that Del Águila had told him that Rosario could perform those tasks and he should talk directly to Del Águila if he had any inconveniences with that assignment.

78. Rosario talked to Del Águila and his answer was the same as before: He had a medical certificate that stated Rosario had no restrictions and he had to do the work or be terminated from his job.

79. Due to the new duties imposed by Defendants and the requirement to use the steel boots during all of his working hours the pain experienced by Rosario became increasingly unbearable.

80. Between July and September 2013, Defendant, through Del Águila's instructions, more duties were imposed to Rosario that made even more burdensome his working conditions, such as: (i) receiving and accommodating merchandise and (ii) dispatching parts to service personnel and mechanics.

81. At least on a weekly basis since July 2013, Rosario would tell Pagán that all these new tasks such as heavy lifting and having to stand and walk for long periods of time, was affecting his condition, he was suffering constant pain and he wanted to be reinstated to his original position.

82. The last time Rosario requested Pagán to help him to talk to Del Águila in providing Rosario with a reasonable accommodation, Pagán told Rosario he could not do anything more because he feared that if he kept talking on behalf of Rosario he could lose his job.

83. Defendants denied Rosario any reasonable accommodation requested by Rosario.

84. On September 16, 2013, at 3:40 pm, Defendants terminated Rosario's employment, because one of the positions of Service Coordinator was eliminated.

85. Del Águila's wife, who had started working for Defendant Blue Line P.R. around January or February 2013 had less seniority than Rosario as a Service Coordinator as well as in Blue Line PR , was not terminated but instead Rosario was terminated.

86. Rosario was not allowed to go back to the trailer to recover his personal belongings and had to leave them behind.

## V. STATEMENT OF CLAIMS

### FIRST CAUSE OF ACTION:
*Discrimination Due To Disability Under ADA and ADAA*

87. Rosario alleges and realleges all previous paragraphs as if fully alleged herein.

88. Defendants discriminated under the ADA by failing to make reasonable accommodations to the known physical limitations of Rosario in violation of 42 U.S.C. § 12112(b)(5)(A), for which he is entitled to damages as stated in the causes of action mentioned below.

89. Defendants are covered entities under the ADA.

90. Rosario is a qualified individual, disabled within the meaning of ADA.

91. Rosario suffers an impairment and/or disability which substantially limits various major life activities such as endocrine function, walking, running, standing, sitting, lifting, as a result of his medical condition known as diabetic polineuropathy.

92. Rosario's impairment is neither transitory, nor minor, but to the contrary is a progressive, degenerative condition that affects the nervous system.

93. At all times, Rosario was qualified and capable of performing, with or without reasonable accommodation, the essential functions of Rental Coordinator and of Service Coordinator.

94. Defendants, despite knowing of Rosario's disability did not reasonably accommodate it but as foretasted made his working conditions worse.

95. Defendants did not engage in any communication exchange or interactive process with Rosario concerning his repeated requests for reasonable accommodation.

96. Rosario's requests for reasonable accommodation did not impose an undue hardship on the operation of Defendant's business.

97. Rosario didn't know and was not informed by Defendants, of his federally and statutory protected rights under ADA.

98. Defendants did not have any notices or information accessible to employees describing the provisions of ADA as required by Sec. 12115 of Title 42 U.S.C. 12115, informing employees with disabilities of their protected rights.

99. After Rosario took a medical leave due to his disability Defendants incurred in a series of continuous discriminatory acts against Rosario that started when (i) Rosario tried to return from disability leave and Defendants refused to provide him with reasonable accommodations to return to work on October 2012; (ii) when Defendants failed to reserve his position while he was on medical leave and gave it to another employee; (iii) the imposition of substantial changes and burdensome working conditions which contributed to worsen his disability, among other discriminatory acts mentioned in the statement of facts, being the last discriminatory act Rosario's termination of employment on September 2013.

## SECOND CAUSE OF ACTION:
### *Retaliation under ADA and ADAA*

100. Rosario alleges and realleges all previous paragraphs as if fully alleged herein.

101. Defendants retaliated against Rosario in violation of section 503 of ADA, 42 U.S.C. § 12203, since Rosario engaged in a protected activity when requesting reasonable accommodation in various instances and Defendants denied such requests, finally terminating Rosario's employment.

102. Rosario suffered various adverse employment actions of a continuous nature as a result of his requests for reasonable accommodations, as stated in ¶ 97 of this Complaint, among other acts aforementioned in the statement of facts, being the ultimate adverse employment action and discriminatory act the termination of his employment.

103. Considering the actions taken by the Defendants and the time lapse between the accommodation requests and these actions, there must be no doubt that these employment actions were adverse and motivated by Defendants desire to retaliate against Rosario and force him to resign and after failing in multiple unfair labor practices terminated his employment.

104.  As a direct and proximate cause of Defendants' aforementioned conduct, Rosario has suffered and will continue to suffer emotional and financial damages estimated at no less than two hundred thousand dollars ($200,000.00), under this cause of action.

## THIRD CAUSE OF ACTION:
*Discrimination Due To Disability Under State Law 44*

105.  Rosario alleges and realleges all previous paragraphs as if fully alleged herein.

106.  Law 44 is Puerto Rico's state law equivalent to ADA, which was modeled after the ADA. Thus, the elements of proof for a claim under Law 44 are essentially the same as for a claim under the ADA.

107.  Law 44 states that its dispositions should be liberally interpreted in favor of persons with disabilities. See PR Laws Ann., tit. 1 § 511a.

108.  Rosario is a qualified individual with a disability according to Law 44.

109.  Defendants are private entities covered under Law 44 who engaged in unlawful discrimination towards Rosario in violation of Law No. 44 as stated in the First Cause of Action of this Complaint and the statements of facts.

110.  The facts set forth in this Complaint constitute discrimination due to Rosario's disability and requests for reasonable accommodation and thus are also in violation of Law 44.

111.  As a result of Defendants' discrimination, Rosario is entitled to double the amount of damages caused by Defendants, including but not limited compensatory damages, front and back pay, and all damages requested in this Complaint under Federal and State law are subject to be doubled pursuant to 29 L.P.R.A. § 147(a), which has been extended to apply to Law 44.

## FOURTH CAUSE OF ACTION:
*Violation of Puerto Rico Disability Benefit Act of June 26, 1968 ("SINOT")*

112.  Rosario alleges and realleges all previous paragraphs as if fully alleged herein.

113.  USAble Life Insurance Company ("USAble") was the private insurance company hired by Defendant to provide its employees with the disability insurance coverage mandated by Puerto Rico Disability Benefit Act ("SINOT" for its Spanish acronym).

114.   Early in September 2012, Rosario's disability forced him to take a short-term disability leave for which he filed a claim form with USAble through Defendant, applied for medical leave and provided a medical certificate form completed by his physician explaining his disability.

115.   Rosario's short-term disability leave was covered by USAble.

116.   At the end of September 2012 Rosario provided a certification stating he was able to return to work by October 1, 2012, to perform his job as Rental Coordinator, with restrictions to not lift heavy equipment and be standing for extended periods of time.

117.   Defendant refused to accept Rosario's medical certificate to return to work until he provided one stating he had no restrictions. See paragraphs 35-44 of this Complaint.

118.   Rosario's restrictions did not interfere with the performance of his duties as Rental Coordinator.

119.   Before Rosario returned from medical leave, Defendant posted in its internal newsletter Rosario's job as vacant and assigned it to Ayala, another employee, who had previously occupied the position of Service Coordinator.

120.   Defendant failed to reserve Rosario's position as Rental Coordinator, which he had efficiently performed for almost 9 years, to which he was qualified and ready to return to work.

121.   Rosario returned to work on November 2012 and requested to be reinstated in his job as Rental Coordinator. Rosario was mentally, physically and otherwise competent and capable to discharge his duties as Rental Coordinator at all times he requested reinstatement.

122.   Rosario's employment was available when he requested reinstatement but Defendant denied his request. Since Rosario's position was given to another employee within 30 days since he requested to be reinstated after coming back from disability leave the position was presumed to be vacant as provided under 11 P.R. Laws Ann. § 203(q)(3).

123.   Defendant's failure to reserve Rosario's position during the period he was disabled constitutes a violation of 11 P.R. Laws Ann. § 203(q).

124.   In addition, Defendants transferred Rosario to another position which, at the beginning, appeared to be of an equivalent nature as the one he originally occupied. Later on, Rosario was required

to perform tasks of a completely different nature that involved active and heavy physical activity, which he was not supposed to perform due to his disability, nor it was in accordance with his job description. The position he was transferred to was later closed and became the alleged reason for his termination;

125. Rosario's termination from employment constitutes an illegal and non-compensated termination in violation of SINOT, which entitles him to compensation for damages suffered as a consequence of Defendants refusal to reserve his employment, which ultimately resulted in the termination of his employment, as well as physical and emotional damages suffered by him as a result of being transferred to another position and all negligent and intentional acts of Defendants which forced Rosario to perform tasks that affected his disability, damages such as back pay, front pay and all other damages suffered after his termination, fully incorporated herein as alleged in causes of actions Eighth through Eleventh.

## FIFTH CAUSE OF ACTION:
### *Violation to FMLA*

126. Rosario allege and reallege all previous paragraphs as if fully incorporated herein, specifically ¶¶ alleged in the Fourth Cause of Action above mentioned.

127. Rosario worked over 1,250 hours during the 12 month period immediately preceding the commencement of his medical leave on September 2012.

128. Defendants had 50 or more employees in 20 or more workweeks in the current or preceding calendar year and are engaged in commerce.

129. Defendants decision to terminate Rosario was made with malice and with reckless and willful indifference to Rosario's federally protected rights under the FMLA.

130. As a direct and proximate cause of Defendants aforementioned conduct, Rosario has suffered and will continue to suffer monetary damages, costs, expenses and attorneys fees estimated in an amount not less than seventy thousand dollars ($70,000.00), but would be subject to increase depending on the date that this trial concludes.

## SIXTH CAUSE OF ACTION
### *Statutory Indemnification under Law 80 for Plaintiff's Wrongful Discharge*

131.   Rosario alleges and realleges all previous paragraphs as if fully alleged herein.

132.   Rosario was unlawfully discharged from his job without just cause in violation of Law No. 80, with the false pretext that his position was being eliminated because of staff reduction, when the truth is he was discriminatorily discharged because of his disability.

133.   In the alternative, even if no discrimination took place, if Defendant had reserved Rosario's employment position as a Rental Coordinator as provided by SINOT, he would have been occupying the position of Rental Coordinator which was not part of the alleged "staff reduction".

134.   Around March 2013, *Defendant* opened a new Service Coordinator position, the same position held by Rosario, to accommodate Del Águila's wife. On September 2013, Rosario's employment was terminated because his position was being eliminated and Del Águila's wife, who had started working for Defendant Blue Line PR around January or February 2013, who had less seniority than Rosario as a Service Coordinator as well as working for Blue Line PR , was not terminated.

135.   All above acts were simply a subterfuge designed to force Rosario to resign and after failing, terminated his employment without just cause.

136.   Law 80 allows for the termination of an employee for just cause for 6 reasons, only 3 of them related to business reorganizations or reductions in their workforce, as stated under subsections (d),(e) and (f) of § 185b, none of which are present here.

137.   Law 80 provides in § 185c that in cases where employees are discharged for the reasons indicated under subsections (d),(e) and (f) of §185b, "it shall be the duty of the employer to retain those employees of greater seniority on the job with preference, provided there are positions vacant or filled by employees of less seniority in the job within their occupational classification which may be held by them…". Defendants ignored § 185c of Law 80.

138.   This means that even if the elimination of the Service Coordinator position was justified as one of the reasons stated in § 185b, Defendants had to comply with section 185c, since there were other positions such as the three Rental Coordinator positions, that was within the same occupational classification and were occupied by three employees with less seniority than Rosario. At the time of

Rosario 's wrongful discharge, Law 80 provided that the indemnity payment for a discharge without just cause would be equivalent to three (3) months pay, plus an additional progressive indemnity equivalent to two (2) weeks pay for each year of service.

139.    In Rosario's case, the severance payment ordered by Law 80, for nine (9) years and three (3) months of service amounted to twenty thousand eight hundred sixty four dollars and thirty-five cents ($20,864.35).

### SEVENTH CAUSE OF ACTION:
*Unpaid Overtime Compensation under Law 379 and FLSA*

140.    Rosario alleges and realleges all previous paragraphs as if fully alleged herein.

141.    Rosario is a non exempt employee of Defendant covered under Law 379 and FLSA, employed by Defendants, two enterprises engaged in commerce or in the production of goods for commerce. Rosario's job duties consisted of clerical/administrative nature which did not rise to the level of importance necessary for them to be an exempt employee from Law 379 or FLSA.

142.    Defendants are enterprises that has had and have an annual gross sales volume of not less than five hundred thousand dollars ($500,000.00).

143.    Rosario had to report to work from Monday to Friday and was required by management to use a time card every morning to register the exact time he started his work day, when he took his lunch hour, when he came back from lunch hour and at the end of the day when he was leaving the office.

144.    Rosario's work schedule was required to report to work for 8 hours a day, from Monday to Friday, and was expected to start working by 7:00 or 7:30am until 4 to 4:30pm, or the equivalent to 8 hours a day.

145.    To record the times of entry and departure, Rosario would use a time card provided by Defendants.

146.    Around January 2013 Rosario was assigned new duties not included in the Service Coordinators' job description. These new duties consisted of coordinating services needed by clients, assigning tasks to be performed by mechanics upon clients requests and keep track of the status of mechanics jobs.

147.   To perform such duties Rosario was given a company mobile phone on January 2013. On average, Rosario would receive no less than 30 calls a day from clients, mechanics, or from sales representatives who would call on behalf of clients, and he would also have to deal with the situations that emerged.

148.   All of the above would take place during working hours as well as outside working hours, between 5:30am until 7pm. There were various occasion in which Rosario had to work during his lunch break.

149.   During the time Rosario had the company phone to perform the above mentioned duties he would use it for the sole purpose of receiving and making calls related to his job.

150.   Rosario estimates that during almost every week between January 2013 to September 2013 he worked at least 10 hours of overtime. For Rosario to be more accurate in this regard he would need access to Defendants phone records for all calls registered to the number assigned to Rosario which was (787) 221-1324. Rosario would also need access to all records and entries Defendants are obliged to make, keep, and preserve related to Rosarios' payroll, stating the salaries earned and the regular hours and extra hours worked by him.

151.   Defendant did not pay Rosario any overtime compensation for the time spent by Rosario performing his duties outside working hours.

152.   Since January 2013 and September 2013, when Rosario's employment was terminated Rosario, had worked for more than 40 hours per week. Defendants are liable for unpaid overtime compensation worked by Rosario in excess of the prescribed hours at a rate not less than one half times the regular rate earned by Rosario Plaintiff during the period of November 2012 through September 2013 and an equal amount in liquidated damages, which is estimated in an amount of five thousand ($5,000.00), an amount that may increase or decrease subject to discovery, as well as costs, expenses, and attorney's fee incurred by Rosario.

### EIGHTH CAUSE OF ACTION:
*Award of Back Pay, Front Pay and Other remedies under ADA and Civil Rights Act of 1964*

153.    Rosario alleges and realleges all previous paragraphs as if fully alleged herein.

154.    As a direct result of Defendant's unlawful actions, Rosario is entitled to an award for back pay, front pay, as well as any other equitable relief, pursuant to Title VII of the Civil Rights Act of 1964.

155.    Since Rosario's employment was discriminatorily and unjustly terminated, he has tried to mitigate his damages and has been actively seeking other employment not being able to find one.

156.    Rosario has sent resumes to approximately 20 places, and has contacted and attended 5 job interviews but hasn't been able to find a job.

157.    The amount of back pay is presently estimated at no less than seventy thousand dollars ($70,000.00), since Rosario's employment was terminated until December 2014, but it's subject to increase depending on the date this trial concludes.

158.    Defendant has expressed that reinstatement is not possible in this case for which Rosario seeks an award of front pay for the loss of future income he would have earned if it were not for Defendants' discriminatory termination of his employment.

159.    Before Rosario was discriminatorily discharged from his employment he had been working for 9 years and 3 months, and was physically and mentally capable of working at least for the next 15-20 years of his life.

160.    In spite of Rosario's reasonable efforts to seek a job, there are various other factors that have affected his ability to find a job, such as Puerto Rico's adverse economic situation, unavailability of other work opportunities comparable to his old work, limitations as to the duties he can perform because of his disability, his age (47 years old), his level of education when compared to other younger applicants and academically more prepared, and lastly, his working experience for the past 9 years and a half had been in a very specific and saturated industry, among other factors.

161.    The amount of front pay is presently estimated at no less than five hundred thousand dollars ($500,000.00), Rosario would have generated for the next 15-20 years he intended to keep working.

**NINTH CAUSE OF ACTION:**
*Compensatory and Punitive Damages*

162.   Rosario alleges and realleges all previous paragraphs as if fully alleged herein.

163.   Defendants, when treated jointly have continuously employed between 200 and 500 employees.

164.   Defendant acted with malice and reckless indifference towards Rosario's federally protected rights in violation of ADA, intentionally discriminating against him by harassing and retaliating against him by imposing increasingly burdensome working conditions because of his known disability and the reluctance to agree to his requests of reasonable accommodation as mentioned throughout this Complaint.

165.   As a result of the events described herein, Rosario suffered and continues to suffer considerable damages, including:

a.   Past Pecuniary losses incurred such as job-hunting expenses, medical expenses incurred as a result not having a medical healthcare plan for himself and his family, psychological expenses incurred by himself and his family;

b.   Future pecuniary losses such as monetary expenses for physical and/or psychological therapy that could extend into de future;

c.   Non pecuniary damages for all the emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to professional standing, character or reputation, loss of health and any other intangible losses incurred as a result of Defendants continuous discriminatory conduct;

166.   As a direct and proximate cause of Defendants' aforementioned retaliatory, discriminatory and illegal conduct in violation of ADA and Law 44, Rosario has suffered and will continue to suffer damages, as mentioned above, for which is entitled to recover compensatory and punitive damages as provided under the referred federal and state laws in the amount of three hundred thousand dollars ($300,000.00).

### TENTH CAUSE OF ACTION:
*Damages to Plaintiffs Rosario, Monsegur, their legal partnership and their minor children under Article 1802 of PR Civil Code*

167.   Plaintiffs Rosario, Monsegur, *the legal partnership constituted between the two,* and their two minor children, allege and reallege all previous paragraphs as if fully incorporated herein.

168.  Defendants negligent and intentional unlawful conduct against Rosario, constitute compensable acts under Articles 1802 and 1803 of the Puerto Rico Civil Code, because of the physical, moral, emotional and economic damages caused to Rosario for which he seeks compensation of no less than five hundred thousand dollars ($500,000.00).

169.  On September 13, 2014, Monsegur, the legal partnership constituted between Rosario and Monsegur, and their two minor children, made an extrajudicial claim against Defendants for the cause of action alleged herein under Art. 1802 of the Civil Code.

170.  As a direct and proximate cause of Defendants' negligent and intentional conduct against Rosario, Monsegur and their minor children has suffered and will continue to suffer emotional and financial damages estimated at two hundred thousand dollars ($200,000.00) under this cause of action.

## ELEVENTH CAUSE OF ACTION:
*Attorney's Fees, Cost And Prejudgment Interests*

171.  The Defendants are hereby liable to Plaintiffs for all sums hereby requested as well as for all pre-judgment and post judgment interest, costs and attorney's fees pursuant to the ADA, the Civil Rights Act of 1991 and the Civil Rights Attorneys Fee Act.

172.  Recovery of attorney fees, costs and expenses incurred and interest accrued are also available under the Commonwealth laws invoked in this Complaint.

## RELIEF

WHEREFORE, Plaintiffs pray this Honorable Court to:

1.  Enter a declaratory judgment against Defendants and find them in violation of the laws of the Commonwealth of Puerto Rico and of the United States of America.

2.  Order the Defendants to make Rosario whole by ordering payment of damages as follows:

(i)    Back pay and related benefits in an amount no less than seventy thousand dollars ($70,000.00), which would be subject to increase depending on the date that this trial concludes;

(ii)   Front pay and related benefits in an amount no less than five hundred thousand dollars ($500,000.00);

(iii)    Compensatory and punitive damages as a result of Defendants' illegal discriminatory and retaliatory acts in an amount no less than three hundred thousand dollars ($300,000.00);

(iv)    Double damages of the above mentioned amounts in an amount not less than eight hundred and seventy thousand dollars ($870,000.00);

3.  In the event, no discrimination is found to be present, order an award for statutory indemnification for all the damages caused as a result of violations of SINOT dispositions in an amount not less than eight hundred and seventy thousand dollars ($870,000.00), which could increase depending on the date this trail concludes;

4.  Indemnification for violations to Federal Medical Leave Act for monetary and liquidated damages for an amount not less than seventy thousand dollars ($70,000.00), which would be subject to increase depending on the date this trial concludes;

5.  Statutory Indemnification pursuant to Law 80 for the unjustified termination of Plaintiff's employment, in an amount no less than twenty thousand eight hundred sixty eight dollars with thirty-five cents ($20,864.35);

6.  An award for violations to Law 379 and FLSA for unpaid overtime compensation worked by Rosario and an equal sum in liquidated damages, estimated in an amount of not less than five thousand dollars ($5,000.00), an amount that may increase or decrease subject to discovery;

7.  Order the Defendants to make whole Plaintiffs Monsegur and the minor children C.M.R. and C.R. by ordering payment of damages pursuant to Article 1802 of PR Civil Code in an amount no less of two hundred thousand dollars ($200,000.00).

8.  Award Plaintiffs the costs and attorneys fees incurred in these proceedings and the Administrative proceedings before the Anti Discrimination Unit.

9.  Award the Plaintiff prejudgment and post judgment interests.

10. Grant the Plaintiff such other relief as this Honorable Court deems appropriate and proper.

A JURY TRIAL IS HEREBY REQUESTED.

RESPECTFULLY SUBMITTED.

In Guaynabo, Puerto Rico this January 2nd of 2015.


/s/GLADYS M. MIGUEZ CORUJO
**GLADYS M. MIGUEZ CORUJO**
USDC No. 229310
*gladys.miguez@rgclawpr.com*